# EXHIBIT A

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA
**2021RCCV00028**
DANIEL J. CRAIG
JAN 25, 2021 03:08 PM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

IN THE SUPERIOR COURT OF RICHMOND COUNTY
STATE OF GEORGIA

| | |
|---|---|
| STEPHEN RONALD CALLAHAN, JR., as personal representative of the STEPHEN RONALD CALLAHAN, SR.; and LINDA D. CALLAHAN, individually and as surviving spouse of STEPHEN RONALD CALLAHAN, SR., deceased,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCED SLEEP TECHNOLOGIES, INC.; JOSEPH L. POOLE; UNIVERSITY SLEEP ASSOCIATES; AUGUSTA LUNG ASSOCIATES, LLP; JOHN DOES 1-5; and RICHARD ROE CORPORATIONS 1-5,<br><br>Defendants. | CIVIL ACTION No.:<br><br>Jury Trial Demanded |

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiffs Stephen R. Callahan, Jr. as personal representative of the Estaste of Stephen Ronald Callahan, Sr. and Linda D. Callahan, individually and as surviving spouse of Stephen Ronald Callahan, Sr., deceased, by and through counsel, and files this Complaint for Damages against Defendants Advanced Sleep Technologies, Inc.; Joseph L. Poole.; University Sleep Associates; Augusta Lung Associates, LLP; John Does 1-5; and Richard Roe Corporations 1-5 as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Stephen Ronald Callahan, Sr. ("Mr. Callahan Sr.") was born on March 28, 1942 and was a resident of Aiken County, South Carolina before his care and treatment at Augusta Sleep Technologies, Inc. in Augusta, Georgia.

2. Plaintiff Linda D. Callahan ("Plaintiff") is the wife of Mr. Callahan Sr. and a resident of Aiken County, South Carolina.

1

3. Plaintiff Stephen Ronald Callahan, Jr. is the duly appointed personal representative of the estate of Stephen Ronald Callahan, Sr.

4. Upon information and belief, Defendant Advanced Sleep Technologies, Inc. ("Advanced Sleep") was at all material times a Georgia for-profit corporation authorized to do business in the State of Georgia and doing business in Richmond County. Advanced Sleep maintained a principal office at 1 George C. Wilson Court, Suite A, Augusta, Georgia 30909 and may be served through its registered agent, Joseph L. Poole a/k/a Joe Poole, at 6475 Carriage Lane, Harlem, Georgia 30814.

5. Upon information and belief, Defendant Joseph L. Poole ("Poole") was acting as owner and Chief Executive Officer of Defendant Advanced Sleep and established, acquired, owned, maintained, controlled and/or operated the Facility, along with Defendants. Defendant Poole is a Georgia resident, is subject to the jurisdiction of this Court, and may be served at his residence 6475 Carriage Lane, Harlem, Columbia County, Georgia 30814.

6. Upon information and belief, Defendant Augusta Lung Associates, LLP ("Augusta Lung"), at all material times, provided a full range of office care, critical care, and diagnostic services for patients with lung disorders, including sleep apnea consultations and sleep studies. Defendant Augusta Lung was at all material times a Georgia for-profit limited liability partnership authorized to do business in the State of Georgia and doing business in Richmond County. Augusta Lung maintained an office at 1301 Broad Street, Augusta, Georgia 30901.

7. Upon information and belief, Defendant University Sleep Associates ("USA") was at all material times a Georgia company authorized to do business in the State of Georgia and doing business in Richmond County and maintained an office at 1301 Broad Street, Augusta, Georgia 30901.

8. Plaintiff intends to name as defendants any other entity that, either directly or by

joining or in concert with others was negligent and breached the applicable standard of care in assessing, caring for, and treating Mr. Callahan Sr. while he was a patient at the Facility and was responsible for the actions or inactions that caused Mr. Callahan Sr.'s injuries and death. Defendants John Does 1-5 are unknown or unidentified persons or entities within the network of individuals and businesses which participated in these acts and omissions.

9. Plaintiff intends to name as defendants any other entity who are, or were, an alter ego of the Defendants named in this action, or who were agents of or joint-venturers with the named Defendants. Defendants Richard Roe Corporations 1-5 are unknown or unidentified entities that are, or were, alter egos of Defendants or agents of or joint-venturers with the named Defendants in the establishment, ownership, operation, management, or control of the Facility. Plaintiff cannot determine the exact number or identities of such individuals or entities at this time.

10. Whenever the term "Defendants" is utilized in this Complaint, such term collectively refers to and includes all named Defendants in this lawsuit, unless specifically restricted within a cause of action or as further defined below.

11. Upon information and belief, Defendants maintained and operated "Advanced Sleep Technologies at University Sleep Associates," including the performance of sleep studies upon patients such as Mr. Callahan Sr., at the offices of the Defendant Augusta Lung located at 1301 Broad Street, Augusta, Georgia 30901 (the "Facility").

12. At all material times, Defendants remained actively engaged in and transacted business in Richmond County, Georgia, by establishing, acquiring, owning, maintaining, and/or operating the Facility.

13. At material times hereto, Defendants charged and were paid for services rendered to Mr. Callahan Sr.

14. Whenever in this Complaint it is alleged that Defendants did any act or failed to do

any act, it is meant that the officers, partners, members, managers, agents, employees, servants, joint-venturers, or representatives of the designated Defendants respectively performed, participated in, ratified, or failed to perform such acts while in the course and scope of their employment, agency, partnership, joint or other representative relationship with the Defendants.

15. Defendants are directly liable by virtue of their own conduct for the wrongful acts detailed herein. Defendants are also vicariously or indirectly liable for the for the wrongful conduct detailed herein under one or more of the following alternative legal theories:

a. ***Alter Ego***: At all material times, Defendants were *alter egos* of one another. Defendants conducted these entities, including Advanced Sleep Technologies at University Sleep Associates, as if they were one by commingling them on an interchangeable basis or confusing separate properties, records, or control.  Furthermore, Advanced Sleep Technologies at University Sleep Associates was a subsidiary, affiliate, and/or alter ego of Defendants.  Advanced Sleep Technologies at University Sleep Associates was merely a conduit through which the Defendants did business.  The management and operations of Advanced Sleep Technologies at University Sleep Associates were so assimilated within the Defendants that Advanced Sleep Technologies at University Sleep Associates was simply a name through which the Defendants conducted their business. The Defendants so Advanced Sleep Technologies at University Sleep Associates, and any assertions by the Defendants that each was a separate corporate fiction with an independent and separate existence is a sham and part of a scheme to perpetrate fraud, promote injustice, and evade existing legal and fiduciary obligations.

b. ***Agency***: At all material times, Defendants acted as agents for one another and each ratified or authorized the acts or omissions of the other.

c. ***Joint Venture/Enterprise***: In the alternative, Defendants are each liable for the acts and omissions of the other because they were engaged in a joint venture and enterprise and acted in concert in the establishment, operation, management, and control of the facility. Defendants shared a common purpose in establishing, operating, managing, and/or controlling Advanced Sleep Technologies at University Sleep Associates and combined their property and labor in Advanced Sleep Technologies at University Sleep Associates for the purpose of making a profit. Defendants each had a right of mutual control over the establishment, operation, management,

       control, supervision and maintenance of Advanced Sleep Technologies at University Sleep Associates.

   d. ***Amalgamation of Interests***: Defendants each remain liable for the acts and omissions of the other because the Defendants are and have been operating as an integrated enterprise and/or joint venture in the establishment, operation, management, and control of Advanced Sleep Technologies at University Sleep Associates. Defendants shared a common purpose in establishing, operating, managing, and controlling Advanced Sleep Technologies at University Sleep Associates and combined their property and labor in Advanced Sleep Technologies at University Sleep Associates, intentionally blurring the legal distinction between the entities and their activities, for the purpose of making a profit.

16. Defendants had the right and/or power to direct and control their employees and/or agents in the business of delivering care for a fee through the Facility and they are personally, jointly, and severally liable for the acts and omissions committed.

17. Further, while engaged in the conduct alleged herein, Defendants each acted with the express or implied knowledge, consent, authorization, approval, and/or ratification of the other Defendants.

18. The acts and omissions forming the basis of this Complaint arose in Richmond County, Georgia, and Defendants are subject to the jurisdiction of this Honorable Court. Ga. Const. 1983, Art. VI, Sec. IV, ¶ 1; O.C.G.A. § 15-6-8. Venue is proper in Richmond County, Georgia. Ga. Const. 1983, Art. VI, Sec. II, ¶ 6; O.C.G.A. §§ 14-2-510, 14-3-510.

## FACTUAL BACKGROUND

19. During 2017 and 2018, Mr. Callahan Sr. was a patient of Augusta Lung in Augusta, Georgia and was treated for chronic obstructive pulmonary disease (COPD), obstructive sleep apnea syndrome, and related issues. In addition to COPD, Mr. Callahan Sr.'s history included but was not limited to congestive heart failure (CHF), coronary artery disease (CAD), rheumatoid arthritis, obesity, lower extremity edema, altered mental status, and dizziness. Mr. Callahan Sr.

5

also required use of oxygen due to shortness of breath and a walker for mobility.

20. On December 6, 2018, Mr. Callahan Sr. was seen by A. Lynne Brannen, MD ("Dr. Brannen"), and Melissa Renee Broske, NP, at Augusta Lung located at 1301 Broad Street in Augusta, Georgia. During that visit, Dr. Brannen scheduled a sleep study for Mr. Callahan Sr. on January 25, 2019.

21. Based upon his medical history, Defendants knew or should have known that Mr. Callahan Sr. was a fall risk and had difficulty standing, transferring, and ambulating without adequate assistance.

22. On January 25, 2019, Mr. Callahan Sr.'s son drove his father to the Facility for the sleep study. The study was attended and overseen by one of Defendants' sleep technicians. After dropping his father off, Mr. Callahan Sr.'s son was instructed that his father's study would be completed by 7:00 A.M. the following morning.

23. On January 26, 2019, Mr. Callahan Sr.'s son returned to the Facility to pick up his father as directed and knocked on the door of the Facility upon arrival.

24. At that time, Mr. Callahan Sr. was also being transferred from his bed to a chair by the Defendants' sleep technician. In responding to the knock at the door, the Defendants' sleep technician abandoned her assistance of Mr. Callahan Sr. and went to open the door, despite Mr. Callahan Sr.'s need for continued assistance.

25. Mr. Callahan Sr. lost his balance and fell backwards hitting a table before striking the floor. Mr. Callahan Sr.'s son and the Defendants' sleep technician heard the crashing sound of Mr. Callahan Sr.'s fall and his father crying out in pain.

26. After the fall, the Defendants' sleep technician assisted Mr. Callahan Sr. to a chair. Mr. Callahan Sr. indicated that his back hurt, and Mr. Callahan Sr.'s son observed an abrasion.

27. Defendants' sleep technician stated she would notify Mr. Callahan Sr.'s physician

of the fall; however, there is no indication from medical records that such notification occurred.

28.     After departing the Facility, Mr. Callahan Sr.'s back pain worsened, and on January 28, 2019, Mr. Callahan Sr. was seen at University Prompt Care (UPC) in Aiken, South Carolina. During his examination, UPC medical staff noted Mr. Callahan Sr. exhibited decreased range of motion, tenderness, edema, and back and flank pain with a severity of 9 out of 10.  UPC medical staff also noted that it hurt for Mr. Callahan Sr. to breathe.

29.     Due to bruising, swelling, and pain associated with his fall two (2) days earlier, UPC medical staff ordered lumbar spine and torso/chest x-rays, which identified compression fractures to Mr. Callahan Sr.'s T12 and L2 vertebrae. Mr. Callahan Sr. was discharged to University Hospital's emergency department for further evaluation and treatment.

30.     Over the next few weeks, Mr. Callahan Sr. continued to suffer from his fall and spinal fractures, including severe pain.  His condition and overall health deteriorated, and on February 16, 2019, less than one (1) month after his traumatic fall and injuries at the Facility, Mr. Callahan Sr. passed away from related complications.

## COUNT I
### PROFESSIONAL NEGLIGENCE

31.     Plaintiffs re-alleges and incorporates by reference Paragraphs 1 through 23 as if fully set forth *verbatim*.

32.     Defendants, individually and collectively, and by virtue of their own independent actions, and while acting as *alter egos* and agents of one another, and while acting as joint venturers in the establishment, operation, management, and/or control of the Facility, and while acting through the healthcare providers and staff employed by them at the Facility, owed a duty to Mr. Callahan Sr. to comply with the standard of care and skill exercised by healthcare providers

generally under similar conditions and like surrounding circumstances as those presented by Mr. Callahan Sr. during his admission at the Facility.

33. Defendants, individually and collectively, and by virtue of their own independent actions, and while acting as *alter egos* and agents of one another, and while acting as joint venturers in the establishment, operation, management, or control of the Facility, and while acting through the healthcare providers and staff employed by them at the Facility, violated the standard of care and skill exercised by healthcare providers generally under similar conditions and like surrounding circumstances such as those presented by Mr. Callahan Sr. in their care and treatment of him. Their professional negligence includes, but is not limited to, the following:

   a. Failure to provide Mr. Callahan Sr. a safe environment;

   b. Failure to provide adequate and appropriate services in the Facility to accommodate the individual needs of Mr. Callahan Sr.;

   c. Failure to provide staff with the knowledge, skills, and competencies to care for patients at risk for falls, including patients such as Mr. Callahan Sr. with advanced age and physical limitations;

   d. Failure to accurately and timely assess and monitor Mr. Callahan Sr., including his risk for fall-related injuries;

   e. Failure to obtain and provide timely and appropriate assessments/reassessments of Mr. Callahan Sr.'s changes of condition, including reassessment following his fall with injury;

   f. Failure to provide complete care plans individualized to Mr. Callahan Sr.'s specific needs;

   g. Failure to develop and implement comprehensive and individualized care plans to account for Mr. Callahan Sr.'s physical limitations and protect against his overall physical decline, including prevention of falls;

   h. Failure to provide appropriate fall interventions to protect Mr. Callahan Sr. from injuries related to falls;

    i. Failure to provide appropriate assistance with transfers to prevent falls, including contact guard assistance or stand-by assistance;

    j. Failure to adequately supervise Mr. Callahan Sr. to prevent falls;

    k. Failure to timely alert Mr. Callahan Sr.'s physician of his change in condition and/or significant injury;

    l. Failure to consistently, appropriately and completely document information related to Mr. Callahan Sr.'s health status, care, treatment, and injuries; and

    m. Failure to maintain complete and accurate medical records free from missing records, late entries, and discrepancies in documentation.

34. Pursuant to O.C.G.A. § 9-11-9.1 and to the extent this statute applies to this action, Plaintiff has attached hereto and incorporated herein as <u>Exhibit A</u> the affidavit of Donna S. Jones, RN, who is qualified as an expert on the issues raised in this Complaint. This affidavit specifies at least one negligent act or omission by Defendants. The attached affidavit is not inclusive of each act, error or omission that has been committed, or may have been committed, by Defendants, and Plaintiff reserves the right to contend and prove additional acts, errors and omissions on the part of the Defendants that reflect a departure from the requisite standard of care.

35. As a direct and proximate result of Defendants' violations of the standard of care and negligent conduct, Mr. Callanan suffered multiple injuries including but not limited to: (a) a traumatic fall; (b) skin abrasion, bruising and swelling to his back and flank area; (c) painful compression fractures of two second vertebra ; (d) difficulty breathing; (e) additional medical care and treatment; (f) disability; (g) disfigurement; (h) mental and physical decline; (i) physical pain and suffering; (j) mental anguish; (k) persistent discomfort as a result of his injuries; (l) insults to his human dignity; (m) violation of his rights; (n) loss of enjoyment of life; (o) medical bills and other expenses, and (p) other economic and non-economic damages, all substantially contributing to and hastening Mr. Callahan Sr.'s untimely death.

36. Defendants are liable to Plaintiff Linda D. Callahan, as surviving spouse, for the full value of the life of Mr. Callahan Sr.

37. Defendants are liable to Plaintiff Stephen Ronald Callahan Jr. as the personal representative of the estate of Mr. Callahan Sr., for physical and mental pain and suffering experienced by Mr. Callahan Sr. prior to his death as well as his medical, funeral, and burial expenses.

38. If any of the acts or omissions complained of in this count are deemed to involve ordinary negligence rather than professional negligence, they are alternatively incorporated and averred as part of Count II below.

## COUNT II
### ORDINARY NEGLIGENCE/SIMPLE NEGLIGENCE

39. Plaintiffs re-alleges and incorporates by reference Paragraphs 1 through 38 as if fully set forth *verbatim*.

40. This count asserts claims of ordinary negligence. The acts or omissions complained of herein may be assessed by the trier of fact on the basis of common, everyday experiences and the common knowledge of a lay person. The acts or omissions complained of here do not implicate questions of professional judgment or medical competence, nor do they involve matters of medical science or art requiring specialized knowledge, training, or skills not possessed by lay persons. Moreover, the acts or omissions complained of herein involve custodial neglect perpetrated by persons who were not medical professionals and/or the acts and omissions complained of herein resulted from the dangerous administrative policies, systems, directives, and/or practices engaged in by Defendant, which affected Mr. Callahan Sr.

41. Defendants had a duty to exercise ordinary and reasonable care in providing services to Mr. Callahan Sr., including, but not limited to, the following: assisting with transfers;

assisting with activities of daily living; and observing, documenting, and reporting abnormal findings to physicians.

42. Defendants, individually and collectively, and by virtue of their own independent actions and while acting as *alter egos* and agents of one another, and while acting as joint venturers in the establishment, operation, maintenance, supervision, management, or control of the Facility, and while acting through staff employed by them, failed to exercise ordinary and reasonable care in provision of services for Mr. Callahan Sr. Defendants' ordinary negligence included, but was not limited to:

    a. Failure to provide sufficient numbers of staff to meet Mr. Callahan Sr.'s fundamental needs for care and services;

    b. Ongoing failure to accurately and appropriately document care provided to Mr. Callahan Sr.;

    c. Ongoing failure to keep a complete, concise and accurate medical record for Mr. Callahan Sr.;

    d. Failure to provide a safe environment, including prevention of falls;

    e. Failure to provide adequate and appropriate supervision to protect against fall-related injuries;

    f. Failure to provide appropriate and available fall prevention measures to protect Mr. Callahan Sr. from fall-related injury, including adequate supervision and assistance;

    g. Failure to provide appropriate assistance with transfers to prevent falls;

    h. Failure to hire, adequately screen, and train adequate and appropriate personnel to monitor, supervise, care for, and/or treat Mr. Callahan Sr.;

    i. Retention and assignment of unfit, unqualified and incompetent direct care staff to monitor, supervise, care for, and/or treat Mr. Callahan Sr.;

    j. Failure to adequately screen, evaluate, and check references, test for competence, and use ordinary care in selecting personnel, resulting in direct care givers who were unfit to provide care to Mr. Callahan Sr.;

    k. Failure to establish and implement appropriate corporate budgeting policies which were consistent with the needs of patients of the Facility, including Mr. Callahan Sr.;

    l. Failure to allocate sufficient financial resources, thereby causing harm to Mr. Callahan Sr. described above;

    m. Creation and enforcement of operational budgets which deprived patients of adequate staffing and supplies, and caused neglect;

    n. Failure to establish, implement, and/or enforce appropriate safety, training, staffing, and fundamental policies and procedure to prevent harm to Mr. Callahan Sr. and avoid the known consequences of inadequate care;

    o. Failure to have systems in place to ensure that that the staff functioned within the scope of their professional practice, education and training to meet the needs of patients, including Mr. Callahan Sr.; and

    p. Failure to provide proper care and services in accordance with Mr. Callahan Sr.'s rights and needs.

43. As a result of the ordinary negligence of Defendants, the Defendants proximately caused injuries to Mr. Callahan Sr. as well as his untimely death, as more particularly described in Paragraph 35.

44. Defendants are liable to Plaintiff Linda D. Callahan, as surviving spouse, for the full value of the life of Mr. Callahan Sr.

45. Defendants are liable to Plaintiff Stephen Ronald Callahan Jr. as the personal representative of the estate of Mr. Callahan Sr., for physical and mental pain and suffering experienced by Mr. Callahan Sr. prior to his death as well as his medical, funeral, and burial expenses.

46. If any of the acts or omissions complained of in this count are deemed to involve professional negligence rather than ordinary negligence, they are alternatively incorporated and averred as part of Count I above.

### COUNT III
### LOSS OF CONSORTIUM

47. Plaintiffs re-alleges and incorporates by reference Paragraphs 1 through 46 as if fully set forth *verbatim*.

48. As a direct result of the actions of all Defendants averred above, Plaintiff, as wife, is entitled to recover the full value of extraordinary damage to her marriage and partnership with Mr. Callahan Sr. due to the acts or omissions of Defendants, including but not limited to, the right arising out of her marriage relationship to the love, companionship, and conjugal affection of her husband. Further, as a direct result of the acts and omissions alleged herein, Plaintiff has been, and will continue to be, deprived of her husband's companionship, society, support, and services.

WHEREFORE, Plaintiffs pray for the following relief:

(a) That a process be issued and copy of this Summons and Complaint be served upon Defendants as provided by law;

(b) That Plaintiffs recover a judgment against the Defendants, jointly and severally, in the form of Special damages in the form of medical bills to date in the amount of $5,668.39 and funeral cost in the amount of $7,880.00 for all claims and counts alleged herein as shown by the evidence at the trial of this case;

(c) That Plaintiffs recover a judgment against the Defendants, jointly and severally, in the form of compensatory damages in an amount in excess of $100,000.00 for Mr. Callahan Sr.'s pain and suffering and medical expenses as shown by the evidence at the trial of this case;

(d) That Plaintiffs recover a judgment against the Defendants, jointly and severally, for the loss of consortium in an amount in excess of $100,000.00 as shown by the evidence at the trial of this case;

(e) That Plaintiffs recovers the costs of this action;

(f) That Plaintiffs be granted a jury to try this case; and

(g) That the Court and jury grant such other and further relief as may be just and proper.

Respectfully submitted, this the 22nd day of January 2021.

   *s/Marion Chace Hawk*
M. Chace Hawk, Ga. Bar No. 440388
A. Keith McAlister, Jr., Ga. Bar No. 286561
Victor C. Hawk, Ga. Bar No. 338650
HAWK LAW GROUP
338 Telfair Street
Augusta, GA 30901
P: (706) 722-3500
F: (866) 295-0234
kmcalister@hawklawgroup.com

*Attorneys for Plaintiff*

# AFFIDAVIT OF DONNA S. JONES, RN

I, personally appeared before the undersigned, an officer duly authorized by law to administer oaths, Donna S. Jones, RN, who, after first having been duly sworn under oath, states as follows:

-1-

I, Donna S. Jones, RN, am over 18 years of age and am competent to testify to the facts and opinions contained in this affidavit. I can read and write and I am laboring under no mental disability.

-2-

I am a registered nurse duly licensed in the state of Georgia. A copy of my curriculum vitae is attached hereto and incorporated herein by express reference hereto.

-3-

I have actively been engaged in the nursing profession for more than three (3) of the past five (5) years. The same is true for at least three (3) of the five (5) years preceding January 25, 2019.

-4-

I am qualified to express the opinions contained herein. As a nurse I have regularly treated patients with symptoms and conditions like Stephen Callahan through the course of his treatment beginning on January 25, 2019, and, with sufficient frequency to establish an appropriate level of knowledge. The same is true for the five (5) years preceding January 25, 2019. I am familiar with the degree of care and skill ordinarily exercised by members of the health care profession generally (the "standard of care"), as it relates to treating patients with symptoms and conditions like Stephen Callahan who are at high risk for falls.

-5-

During my nursing career, I regularly cared for and monitored patients with symptoms and conditions like Stephen Callahan who are at high risk for falls. During at least three (3) of the five (5) years before January 25, 2015, cared for and provided monitoring for patients with symptoms and conditions like Stephen Callahan with sufficient frequency to establish an appropriate level of

1

knowledge. I am familiar with the degree of care and skill ordinarily exercised by members of the health care profession generally (the "standard of care"), as it relates to treating patients with symptoms and conditions like Stephen Callahan who are at high risk for falls.

-6-

All the opinions expressed herein are expressed to a reasonable degree of nursing probability and are based upon my education, training and experience, as well as my review of the following medical records of Stephen Callahan:

a) Augusta Cardiac Care
b) Augusta Lung Records
c) Advanced Sleep Technologies in Augusta, GA
d) Death Certificate
e) Narrative of incident at Sleep Facility by Stephen Callahan Jr.

-7-

Based upon my review of the above-referenced medical records and my education, training and experience, it is my opinion the Health Care Staff at Advanced Sleep Technologies in Augusta, Georgia failed to meet the standard of care and treatment of Stephen Callahan while under their care.

-8-

Stephen Callahan, a 76-year old gentleman had a history of chronic obstructive pulmonary disease (COPD) and required the use of oxygen due to shortness of breath, congestive heart failure (CHF), coronary artery disease (CAD), first degree atrioventricular heart block, right bundle branch block, automated implantable cardioverter defibrillator, (AICD) cardiovascular accident (CVA), hypertension, hyperlipidemia, myocardial infarction with an ejection fraction of 15-20%, rheumatoid arthritis, obesity, lower extremity edema, altered mental status, dizziness and took Ambien for sleep.

On December 6, 2018, Mr. Callahan saw his primary physician and requested his CPAP supplies be transferred to the supplier CareMark. However, before that could happen, a repeat sleep study by Advanced Sleep Technologies in Augusta, GA was scheduled on January 25, 2019.

A narrative report from Mr. Callahan's son indicated prior to having the sleep study, he was being seen by Encompass Home Health for physical and occupational therapy as well home care

2

nurses. The narrative also noted Mr. Callahan required the use of a walker for mobility and oxygen due to his shortness of breath.

The narrative also indicated when Mr. Callahan reported for his sleep study on January 25, 2019 he was using his walker and required the sleep study technician to hook up his oxygen.

When Mr. Callahan's son returned the following morning to take him home, he stated he knocked on the door, and when the technician opened the door for him, they immediately heard a crashing sound and his father crying out in pain. Mr. Callahan was found on the floor next to the bed and nightstand. According to Mr. Callahan's son, after the fall, the technician assisted him to a chair at which time Mr. Callahan indicated his back hurt. Upon examination, it was noted his back had a red area as well as scrapes. The technician said she would notify Mr. Callahan's physician; however, there was no documentation in the sleep study record the physician was notified regarding his fall.

Mr. Callahan told his son the technician had been helping him out of bed when they heard the knock on the door. He informed his son the technician went to answer the door and left him to get to the chair by himself. He stated he did not have his walker, lost his balance and fell hitting the nightstand before hitting the floor.

As the day wore on Mr. Callahan indicated his back pain became more severe and he was taken to the Urgent Care Center where x-rays showed multiple cracked vertebrae. He was seen by orthopedics, was treated with pain medication and continued with home health care. Over the next few weeks, Mr. Callahan continued to experience severe pain, his over-all health deteriorated and the decision was made to place him in hospice care. Mr. Callahan expired on February 16, 2019, three weeks after his tragic fall.

-9-

I have extensive professional knowledge, skill, education, training and experience regarding the acceptable standard of care applicable to all health care workers, similar to those providing care and support for Mr. Callahan. Based upon my review of the above described records and reliable principles and methods for providing care to high fall risk patients, to a reasonable degree of probability and certainty, and which are consistent with and are supported by my extensive education, professional knowledge, skill, training and experience, the conduct of the sleep study technician at Advanced Sleep Study of Augusta Georgia deviated from the standard of care, while under same or

3

similar conditions and like circumstances employed by healthcare professionals in the area of practice, profession, and specialty at issue. Specifically, the technician:

i) Failed to meet the standard of care by failing to recognize and know when a patient is at high risk for falls. Mr. Callahan, an elderly gentleman, was a high fall risk due to his age, required assistance with a walker for mobility and had numerous co-morbidities including COPD requiring the use of oxygen due to shortness of breath, CHF, CAD, first degree AV block, right bundle branch block, a previous CVA, an AICD, hypertension, hyperlipidemia, myocardial infarction, with an ejection fraction of 15-20%, as well as rheumatoid arthritis, obesity, lower extremity edema, altered mental status, dizziness, and, required Ambien for sleep. The standard of care requires health care workers to recognize, be aware of and take into consideration all comorbidities and risks a patient demonstrates that would increase his fall risk.

ii) Failed to meet the standard of care by failing to implement proper fall precautions for Mr. Stephen Callahan. According to both Mr. Callahan and his son, the technician, at Advanced Sleep Study of Augusta Georgia left Mr. Callahan alone to transfer from the bed to the chair while she went to answer the door. The standard of care requires health care workers to be assured that fall precautions are in place for all patients, particularly for those patients that are at high risk for falls including the elderly, those with numerous co-morbidities and demonstrated episodes of dizziness and poor balance and required a walker for mobility. The standard of care requires health care workers to implement fall precautions including adequate lighting, non-skid socks, as well as contact guard assist (CGA) and/or stand by assist (SBA) when transferring an elderly patient at risk for falls, who has just awakened from sleep, in an unfamiliar location and required the use of a walker for mobility and transfers.

iii) Failed to meet the standard of care by failing to document and/or notify the physician of a patient fall. According the Mr. Callahan's son, the technician stated she would notify the physician of the fall Mr. Callahan experienced. However, there was no documentation on the sleep study notes or in the physician notes that Mr. Callahan had experienced a fall while under her care. The standard of care requires a health care

4


worker to notify the physician anytime an injury occurs to a patient (in this case a fall) while under their care.

-10-

As a result of the multiple negligent acts by the technician at Advanced Sleep Technologies in Augusta, GA, Stephen Callahan suffered multiple fractures to his spine; and this injury substantially contributed to the rapid deterioration of Mr. Callahan's health.

-11-

I make this affidavit under oath, after having been duly sworn, and on the basis of my education, training, and nursing experience in similar matters and after having fully reviewed the afore described documents. This affidavit is given for the limited purpose of identifying at least one negligent act or omission on the part of the health care workers from Advanced Sleep Technologies in Augusta, Georgia. The conclusions and opinions expressed herein are based on the facts and information available to me at the present time, and usually relied upon by experts in the field of nursing and the profession and specialty at issue in this matter. I expressly reserve the right to revise, modify, and/or expand on the opinions set forth in this affidavit.

FURTHER, AFFIANT SAYETH NOT.

_____ (SEAL)
Donna S. Jones, RN

Sworn to and subscribed before me,
and executed by me, this 20TH day
of January, 2021.

_____
Notary Public

My Commission Expires: 12/18/23

(AFFIX NOTARY SEAL HERE)



5